The first case for argument is BLST Northstar et al. versus Santander Consumer USA. Mr. Proctor, we'll hear from you first. Morning, your honors. May it please the court, Dylan Proctor for the appellants. The district court erred by failing to consider both the text of each relevant contract provision and the way those provisions fit together. Instead, the court focused its analysis largely on a single provision taken in isolation. That provision gave Scoots the right to sell the receivables, but other provisions limited that right in order to protect Bluestem's opportunity to buy the receivables back. That opportunity was a core part of the agreement. And you know that because the parties drafted standalone exhibits, which they appended to each agreement, both the program agreement and the SRSA, to include those obligations in both. Bluestem's future was always going to depend on its ability to repurchase the receivables at the end of the program because without a repurchase, Bluestem would have to close all of its customer credit accounts, which would hurt its customer FICO scores, which would destroy Bluestem's business because Bluestem was, in essence, in the credit repair business. And that's what actually happened. As a result of the events at issue here, Bluestem lost hundreds of thousands of customers virtually overnight, lost hundreds of millions of dollars virtually overnight, and today it's out of business. The district court erred in treating the protections that Bluestem bargained for to prevent precisely this outcome as meaningless. So those protections, there are several of them as set forth in our briefs. I'd like to start with the information rights because they are, I think, quite straightforward. After SCUSA delivered its notice of non-renewal, Bluestem invoked its information rights to seek the Castle Lake contract, SCUSA's contract with Castle Lake, so that it could find out, so that it could determine whether it could still make a bid. SCUSA said no repeatedly. That was a clear breach. Now, the district court said that Bluestem didn't have any information rights and wouldn't have any such rights unless and until it made a bid that SCUSA accepted. That's just wrong. The contract doesn't say that. There isn't one word in the contract that says that. And in fact, it says the exact opposite by giving Bluestem rights to information that would only be useful to Bluestem before it made a bid. So the key provision here is subsection F of the purchase of receivables exhibits. Exhibit Q has one of those, exhibit Q to the program agreement, which is conveniently in defendant's addendum at page 13. That provision starts off with the words, notwithstanding any other provision in the SRSA to the contrary. That is, notwithstanding SCUSA's ownership of the receivables and right to sell, SCUSA will, quote, reasonably cooperate in the transfer of the receivables back to Bluestem. And that cooperation includes an obligation to provide Bluestem with all information, that's a quote, all information that Bluestem reasonably determines to be necessary for a series of purposes. Those include assessing the value of the receivables, identifying third-party purchasers for the receivables, and ultimately determining whether to purchase the receivables. Now here's the key. At that point when they made that request, had SCUSA already sold the receivables? Yes, they had. Via the Castle Lake? Yes, they had. So what would then Bluestem have done with that information? Bluestem could have made a bid because what Bluestem did not know at that point in time after, so the chronology is Bluestem makes a bid, SCUSA engages in quite improper, outrageous behavior, ultimately sells to Castle Lake for less money, and then SCUSA delivers its non-renewal. This is a scheme to try to avoid Bluestem's repurchase rates. Once it's sold, I'll just say to Castle Lake through that agreement, was Castle Lake then under the obligation to permit a sale? Yes, it was. That's what your argument is. Yes, it was. Putting aside your representation of the conduct by SCUSA, just as a straightforward matter, am I hearing you say that even though they had already sold the receivables, the new owner of the receivables was under the same obligation? That's exactly right, but that's what Bluestem didn't know. So SCUSA bargained to require Castle Lake to assume its obligations, including its obligations under the purchase of receivables exhibits. When you say they didn't know, what work is that doing here? Bluestem didn't know that Castle Lake was on the hook to satisfy SCUSA's obligations under the purchase of receivables exhibits. So Bluestem, if you put itself in its shoes at this point in time, it makes the highest bid for the receivables. SCUSA sells no, sells to somebody else, then non-renews. Bluestem did not know, and there's ample evidence in the record of this, whether the receivables were available for purchase. So they did what you would naturally do in that circumstance, which is invoke your information rights, which you bargained for up front, the right to get information in order to find out relevant things about the receivables. That's what they did. Turns out, we learn in discovery in this case, that SCUSA bargained to have Castle Lake on the hook to satisfy any bid by Bluestem, but SCUSA refused to provide that information to Bluestem. And the district court finds that this is an acceptable refusal only because Bluestem had no information rights. According to the district court, Bluestem didn't have information rights, and wouldn't unless and until it made a bid that SCUSA accepted. But the entire structure of the purchase of receivables exhibit contradicts that because under that exhibit, you only have a right, let me say that differently, under that exhibit, the bid terms are what control the ultimate sale. So under subsection A, Bluestem had a certain amount of time to make a bid. And then under subsection B, SCUSA had a certain amount of time to accept that bid. And then under subsections D, E, and G, that's the end of it in the sense that once Bluestem makes a bid that SCUSA accepts, the deal is done. There is no more room to negotiate. There is no room to cancel. Well, is there a lot of wiggle room, though, in reasonably cooperate? The term reasonably cooperate? Yeah, that's the active verb here, right? Sure. Reasonably cooperate is a broad term. I think that it's potentially a nebulous term. I would grant that. But it specifically includes the information rights that are enumerated. And again, the key point here is those information rights, the right to determine whether to make a purchase, whether to bid in your own name or the name of a third party, how much to bid, those are not information rights that would even be useful to Bluestem after it made a bid. So under your view of this, Castle Lake would have been required to accept a bid so long as it was higher than the bid that was accepted by Bluestem? I'm sorry, by SCUSA? Castle Lake would have been required to accept a bid. Castle Lake went, turned around and flipped the book. It sold the receivables to another third party called Adelia. It couldn't have done that if Bluestem had made a bid. How quickly? Within several months. Within the time period that it was precluded from doing so under the purchase of receivables exhibits. So the short of it, yes, if Bluestem had known that Castle Lake assumed SCUSA's obligations under the purchase of receivables exhibits, Bluestem would have made a bid. There's ample evidence in the record of this and Castle Lake would have been obligated to honor that bid. And instead, it sold the bid to a third party which destroyed Bluestem's business. Now again, the district court's only basis for rejecting this claim is a non-existent limitation in the contract. There is not one word supporting it. A non-existent limitation that Bluestem had no information rights unless and until it made a bid that SCUSA accepted. And again, the information rights that Bluestem bargained for if you examine the structure of the purchase of receivables exhibits, those are only useful to Bluestem before it makes a bid. Once it makes a bid,  Well, I think the district court was looking at this and looking at A, B, C, D, and G surrounding it. And that's where I think the district court got its logic. How do you reply to that? Yeah, it looks like it has a procedure. Correct, there is a procedure there. And what G, G is illustrative and SCUSA relies on G in its brief. It helps us, it proves our point. G provides that the deal will close, must close based on the Bluestem bid terms. So you have to get your information to help you figure out how much to bid and whether to make a purchase and whether to purchase in your own name or in the name of a nominee before you bid because the bid terms are binding. The bid terms are binding. Once they are made, there is no changing them. There is no negotiation. There is no cancellation. Once you make a bid, the deal is set in stone so long as SCUSA accepts it. Where is that? That's the entire structure of Exhibit Q. So A, subsection A says, provides the time period to make a bid either in your own name or in the name of a nominee. B, provides a time period for SCUSA to accept or reject. And then D, E. With no obligation to. No obligation to, but they can't take a lower bid. They can't take a bid from somebody else. So in that sense, it's akin to, you know, it's a matching right or whatever one wants to call it, right of first offer. It's, they're precluded from selling to somebody else on lower terms, which is what they did two weeks earlier. Are you saying that, will they get the information before they make the bid? I'm saying that Bluestem had a right to the information before they made a bid because the information was information that would only be useful to someone in making a bid. Once you make a bid, you no longer need to know information to help you decide how much to bid. And that's what the information rights were. Information, an obligation, and yes, cooperation is a nebulous term, but the specificity in the information rights is not nebulous. It's clear, and it's a clear right to information to help fashion a bid. The district court's ruling on this, in essence, is that Bluestem had no right to information unless and until the information was useless. Now, that's just not correct. So the- Can I ask a question about F? The A is talking about the purchase of the receivables, correct? Yes. And then in F, we're also talking about assets. Are we talking about program assets? So are we talking about other sort of, other assets in addition to the receivables that might be purchased as well that need to be assessed under the- It's all the same thing. It's all the receivables. So why do we say program, why use a different term, program assets, than receivables? It's just a drafting anomaly, but it's all the program receivables. It's all focused on repurchasing the receivables. I'm short on time, so I'm going to move on to other points if I can. Scusa argues that they reasonably cooperated. The district court did not accept that argument. It's a factual argument. It is refuted by the record. It is undisputed that they did not provide the information that Bluestem demanded. Certainly, this court should not be making that factual determination for the first time. Scusa says that the district court found in their favor on that issue. It did not. And then, because I'm very short on time, I'll try to streamline the rest of this. The assignment issue, the district court did not address the program agreements, non-assignment clause, at all. Not at all. There's not one word in the order about it. That assignment clause undisputedly prohibits any transfer of rights or obligations under the program agreement. Scusa undisputedly had Castle Lake assume all of its rights and obligations under the program agreement. What is the difference in terms of the rights and obligations under the program agreement and under the SRSA? The rights and obligations are, the key point here is the purchase of receivables obligations are under both. They are attached to both agreements. And so, the obligation to satisfy a Bluestem bid is under both. Scusa transferred that obligation to Castle Lake. It says it wasn't a transfer, but if you read the First America case that we cited, Utah decision, it's clear that it was a transfer. Their argument is really that it wasn't a novation, and it wasn't a novation, and under Utah law, it was a transfer, because it wasn't a novation. Because under the SRSA, there's not the limitation. It's just, there's no restriction on the ability to transfer. The SRSA has conflicting provisions on that issue, which is why I'm focusing for now on the program agreement, which has no conflicting provisions. It has an unambiguous restriction coupled with Scusa's admitted demand that Castle Lake assume the obligations. Their only argument is, well, we stayed on as a counterparty. That argument means that there wasn't a novation. It doesn't mean that there wasn't a transfer. That's controlling Utah law. On the confidentiality provision, again, conscious of time, there's really, the district court hung its hat on the idea that section 14 is permissive, not restrictive. It is restrictive. It is a restriction. It is clearly restrictive, unambiguously on its face. Now, Scusa now comes back and says that under section 14A5, that's an incorporation of the SRSA. That's not an argument that the district court accepted. It's one they ran below. The district court did not agree with it, and it's wrong. Section 14A5 is not, certainly not unambiguously, an incorporation of the SRSA. And because it isn't, section 14 controls. Section 14 controls. The last point, I'd like to address the encumbrances issue, but I'm nearly out of time, so I'll just briefly address the implied covenant. The law of implied covenants is messy in New York. It is not messy in Utah. They don't have a single case in Utah that supports their position. Scusa engaged in conduct that factually, clearly was inappropriate, and it's clear in both states that a party cannot deliberately maneuver to deprive another party of the fruits of the contract. That's exactly what Scusa did here. Bluestem bargained for a meaningful opportunity to repurchase the receivables. Scusa, Bluestem bargained for that. Scusa deliberately maneuvered to deprive it of that opportunity. That is a violation of the implied covenant in both states. Very well. Thank you, Your Honor. Thank you, Your Honor. Mr. Mealy, we'll hear from you. Thank you, Your Honors. May it please the Court, Graeme Mealy from Wachtell Lipton, resident of Katz, for the defendant, Epeli Santander, ConsumerUSA, Inc. Your Honors, this is a straightforward case governed by a few clear contract provisions. Those provisions expressly authorized the conduct that plaintiffs challenge. Plaintiffs have two primary complaints in this case, that Scusa sold the receivables to Castle Lake instead of to Bluestem, and that Scusa provided Bluestem's confidential financial information to Castle Lake to facilitate that sale. But the contracts expressly allowed both. They make Scusa the sole owner of the receivables with the right to sell them, and they gave Scusa the right to provide confidential financial information to a potential purchaser of the receivables. There can be no claim for breach here because Scusa was exercising its express contract rights. Interpreting and applying clear contract terms is the province of the Court on a motion for summary judgment, and Judge Magnuson was right to dispose of the case under the contracts. So let's focus on the words of a few key contract provisions. I will get in a few moments to the information rights provisions that were the subject of a lot of the discussion with Mr. Proctor, but I wanted to start with Section 3A1 of the SRSA because I think it is the key provision for purposes of this case. It's on the first page of our addendum, App 640. Section 3A1 says that Scusa shall be the sole owner for all purposes of the receivables that it purchases from Bluestem, and that Scusa shall be entitled to all of the rights, privileges, and remedies applicable to said ownership interests. This is the critical point written in the plainest of terms in the contract. These receivables belonged to Scusa because Scusa bought them from Bluestem. Plaintiffs tell a story as if these were Bluestem's receivables, but that is not what the contractual language says, not the deal that Bluestem made. And the contracts granted Scusa rights in expressed terms that go along with being the owner of the receivables. Section 3A1 lists them, the right to transfer, the right to sell, the right to assign. Critically, Section 3A1 identifies no limitations on the rights to transfer, sell, or assign. And that's very important because Section 3A1 does reference a limitation on another right, the right to enter into a loan or securitization. Scusa shall have the right to enter into a loan or securitization that complies with Sections 3F and G. Compliance with Sections 3F and G is a condition only to the right to enter into a loan or securitization. And everyone agrees that this transaction was not a loan or securitization. It was not a what, I'm sorry? It was not a loan or securitization. It was a fail. Okay. Appreciate it. Yeah. Because that limitation does not apply to the right to sell, it should not be interpreted to apply to the right to sell. The parties enumerated a list of rights all in the same sentence of the contract. Then they stated the limitation that applied to only one of those rights. The logical conclusion is that the parties intended the limitation to apply only to the one right that they specified. And this conclusion cuts across all of the relevant issues. The parties decided what rights Scusa had as the owner of the receivables, and they decided how those rights would be limited. Because the parties addressed these issues, the Court should apply the parties' agreement as written. Now, let me talk a little bit about the information rights since that was the focus. One thing I want to just note at the outset is the information rights provision really is not about what's at the center of their case, which is the sale of the receivables to Castle Lake. There's no — there's no allegation or argument that this provision prevented Scusa from selling the receivables to Castle Lake. As I believe Judge Kelly asked, this is something that happened after the sale already occurred. They can't possibly claim that this was something that restricted the sale in the first place. The way Mr. Proctor argues this is that the — what they were trying to obtain was information about whether the receivables would be available to purchase for them. There's nothing in the record that they cite that shows that they ever asked that question, are the receivables available for us to purchase. Well, would Castle Lake have been obligated under this agreement? Because — because Scusa had submitted the notice of termination, Castle Lake has the receivables. Would they have been obligated before selling to anyone else to accept or to receive a bid from Bluestem? They were obligated to comply with the contractual terms. So to the extent that Scusa had that obligation before, Castle Lake would have taken that on. So, yes, if they — if Bluestem had made a bid, Castle Lake was not obligated to accept it. No one was obligated to accept it. There was no obligation to actually sell the receivables to Bluestem, but they would have had the obligation to abide by the contract, which included not making a sale to a third party on terms that were worse than terms that Bluestem offered. But I think that the key point here — The point here now is they asked the — Bluestem asked the wrong question. That's your — No, not exactly, Your Honor. That's your — go ahead. I think that's what you're saying, that they never asked — go back to where you were before. Yeah, so I think that the point is they were — so there's two points in this. One is the contractual argument, which I can get into, that Judge Magnuson focused on. But then there's also, even if you accept their contractual argument, did — was there a breach of the information request? They sent a number of letters, and these are all letters in the record, clear correspondence, in which they asked for certain information. SCUSA provided certain information in response, including referencing to them what the terms of the sale were, what the price was. They then went on to say, well, we need to know whether — who the owner is so we can determine certain things about the ownership for purposes of servicing the receivables. SCUSA provided that information. Nothing actually in that sequence prevented Castle Lake — sorry, Bluestem from making a bid. They knew the price. They knew the owner. They could have sent the letter at the time that the rights presented it applied, saying we hereby make a bid. SCUSA, can you honor it or not? That didn't happen. We have a situation here where we now have a party in litigation coming forward and making these arguments about how they were somehow deprived of a contractual right, when if you look at the record, they — they didn't attempt to exercise that contractual right at the time that it applied under the contract. And to now say that they were deprived of the right to send a bid because SCUSA didn't comply with — with the request they made is just contrary to the record. And we think that that is a — an undisputed fact that was an alternative basis for Judge Magnuson to rule that this was not breached. We also — What — Yes, Judge Kelley. At what point — it's a 120-day time period, right? When did that start for — Once — once SCUSA sold to Castle Lake, what — what's the — what's the 120-day starting point for Bluestem to have the opportunity to bid? It starts at the time of the notice of non-renewal of the contract. So the notice of the non-renewal of the contract is due at least one year before — before the termination of the contract. So that notice was — so the contract is very specific about the temporal limitations that apply to certain things. The right to present a bid comes into — into effect at the notice of non-renewal and then extends for 120 days after that. That notice of non-renewal has to come at least a year before the termination of the contract. So the contract is still ongoing for that one year. And — and within those one — 120 days, were the receivables sold to — did Castle Lake sell the receivables? When did — when did that sell? I'm trying to figure out whether that happened before Bluestem had an opportunity to put in a bid, regardless of sort of what questions were asked or not. I believe it was after, but I'm not 100 percent certain of that, Your Honor. But the — the subsequent sale by Castle Lake certainly happened after the beginning of the 120-day period. When the exact date of when — What do you mean by the beginning of the 120-day period? It happened after the notice of non-renewal. So it — it happened after their right to present a bid. Do you know if it was after 120 days? I — I don't — I don't know that, Your Honor. I don't — I don't believe it's — it's — it's ultimately relevant to the question here, because, again, they never — they never made the bid to trigger this. Well, wouldn't it be if — if — if Bluestem had 120 days to offer a bid, and on the 121st day, by that time, there's no bid from them, can't Castle Lake go ahead and sell without reference to Bluestem? I — I think that's certainly the case. And as was the case here, the 120 days passed, and Bluestem never made the bid. So we're not — we're — this is a hypothetical that — that never came to be, because they didn't — they never presented the bid. They never attempted to exercise their contractual rights. So we don't have a situation where this may be a different case if they had, within the — within the time period, presented the bid, said, Scusa, we think you have the obligation to — to honor this bid. Can you honor it? And then something would have — But what about their argument that — that really subsection F is the source of the information to actually be able to present a bid? If, in fact, that bid is binding, you can't — you can't budge off of it, why wouldn't they need the information that is described in subsection F? Well, I think that they — they had the information that they needed to determine whether to make a bid. They knew — their — their point is that these receivables were more valuable to them than to anyone else, so they would have bid more for them than Castle Lake would have or anyone else would have. They knew who purchased the receivables. It was Castle Lake. They knew the price at which Castle Lake purchased the receivables. They could have come to Scusa and said, we know that you sold these to Castle Lake for X. We bid X plus one. They — they never did that. So — How did they have that information? Scusa announced it publicly in a — in a form 8K, I believe it was, and then Castle Lake — sorry, Bluestem came to Scusa and said, we need information about this sale that you did to Castle Lake, and Scusa said it's been — we publicly filed information about the agreement which included the price. So they knew — they knew the — the identity of the purchaser. They actually knew the identity of the purchaser before Scusa provided it to them. It's in their first letter. It says, we hear you sold it to Castle Lake. So I hear you saying on the information rights claim, you urged the court to affirm on a different ground. I don't think so, Your Honor. I think we — Well, I thought that was your argument. You said you had presented this other theory to Judge Magnuson. Judge Magnuson — He went on the contract. He actually decided on both grounds. He said that the contract — the contract did not provide the rights at the — in the manner that — that plaintiffs are claiming here. But he said, in any event, I find that Scusa, as a matter of fact, provided the information that was requested to them. So we think that this should be affirmed on both of those — both of those grounds. But even if the court were to disagree — You're saying either one would be sufficient. Either one is — You think — Either one is sufficient performance. You think he affirmed on — you think he ruled on both grounds. Okay. I think he did, yes. Well, do you have anything to say on the contractual language before your time runs out? Yeah, absolutely. So as to the contractual language, the — we think that what Judge Magnuson did on the contractual language on the information rights was absolutely correct. The way the — the Section F of Exhibit A, which is the relevant provision here, is structured, it goes through various steps in the process, the last one of which is a transfer. And the information rights provision, as plaintiffs call it, is in a provision that says that — that Scusa will reasonably cooperate in the transfer of the receivables package, including — and then it goes on to list certain things, including providing certain information about the program assets. And I will note that program assets is a defined term under the contract, which is broader than just the receivables. It's the receivables, the accounts, other things like that. But because of that, we have to see how is the word transfer used in the contract. And what we did was track through how the word transfer is used in the contract. And the word transfer is used in a manner that is different than — than bid. So — so this applies when there's going to be a transfer. So I'll refer to our briefs for the rest of that argument, but we believe that the district court got it correct as to that issue. I want to just hit also briefly, before my time expires, the implied covenant, because I think a lot of this case is now reducing to implied covenant-type claims, which plaintiffs are using as a fallback because they don't have actual words in the contract to support their claims of breach. And that's not what the implied covenant is supposed to be about. Does Utah law control that? Both New York and Utah law, I think, could apply to that. I don't think there's any — because Utah law applies to the program agreement and New York law applies to the SRSA, and they allege breaches of both. I don't think there's any meaningful distinction between Utah law — There appears to be a lot of law in New York and none in Utah. Is that a fair statement? I don't think it's a — I don't think it's a fair statement that there's no law in Utah. We have a couple of district court cases. Is that — a couple of federal cases, right? I think it's fair to say there's less law in Utah than there is in New York, but I don't think there's — I don't think there's anything to indicate that the courts of Utah view this in a way that suggests that there's a conflict of law between them. For example, the — Well, they do say commercially reasonable manner. Yes, but they also acknowledge — and we think this is a key point — the concept that implied covenant claims can't duplicate claims in — under the express contract. And that's a very important concept, which goes to what I just said, which is that this is not just supposed to be a fallback. It's supposed to be an enforcement of a implied promise that's actually in the contract and that it's consistent with the explicit promises in the contract. When you try to use the implied covenant as a fallback that duplicates the express contract claim, you're basically trying to get a second bite of the apple. The contract doesn't say what I want it to, so let's try the implied covenant. And as we laid out in our briefs, we think that that's impermissible under both New York and Utah law. As to Utah, I just refer the Canopy Corporation case, which is a Utah case on duplication, which indicates that it's the same concept there. I'm out of time. Thank you very much, Your Honors. Very well. Thank you for your argument. I think I'm out of time for that one. You are out of time. Well, you used all your time, and you went over your time, and we bear with you. But I appreciate the offer. And unless my colleagues want to hear rebuttal, I think we'll find a conclude. I find a conclude. All right, very well. Well, the case is submitted, and we appreciate the vigorous advocacy and the thorough briefing, and the court will study the matter and issue a decision in due course. So counsel are excused.